**TEXAS MUNICIPAL LEAGUE
INTERGOVERNMENTAL
RISK POOL, Petitioner,**

v.

**TEXAS WORKERS' COMPENSATION
COMMISSION and Subsequent
Injury Fund, Respondents.**

No. 00–1114.

Supreme Court of Texas.

Argued Sept. 19, 2001.

Decided April 4, 2002.

William J. Cobb, Robbi B. Hull, Jim David Bickham, Vinson & Elkins, Jack W. Latson, Flahive, Ogden & Latson, Austin, for petitioner.

John Cornyn, Attorney General of the State of Texas, Andy Taylor, First Assistant Attorney General, Joseph A. Pitner, Linda Eads, Don Walker, Office of the Attorney General of Texas, Austin, for respondent.

Justice BAKER delivered the opinion of the Court in which Chief Justice PHILLIPS, Justice ENOCH, Justice HANKINSON, Justice O'NEIL, Justice JEFFERSON and Justice RODRIGUEZ joined.

This case involves the Texas Workers' Compensation Subsequent Injury Fund and the Texas Municipal League Intergovernmental Risk Pool. The issue is whether the Fund and the regulations implementing the Fund are unconstitutional as applied to the Risk Pool, because they either require Texas cities to make gratuitous payments to individuals, associations, or corporations, or because they impose a statewide ad valorem tax. *See* TEX. CONST. ART. III, § 52(a), art. VIII, § 1–e.

The trial court determined that sections 403.007(a) and 408.184(c) of the Texas Labor Code and the implementing regulations violate both constitutional provisions. The court of appeals concluded that, because the provisions are analogous to custodial-escheat statutes, they are

constitutional. 38 S.W.3d 591. The court of appeals thus reversed the trial court's judgment and rendered judgment in the Texas Workers' Compensation Commission's favor. 38 S.W.3d at 600. We agree the provisions are constitutional, but not for the reasons the court of appeals articulated. Accordingly, we affirm the court of appeals' judgment.

## I. BACKGROUND

The Texas Municipal League Risk Pool includes more than 1,600 Texas cities providing workers' compensation benefits to their employees through a joint-insurance fund. The cities formed the Risk Pool under the Labor Code, which requires all political subdivisions to provide their employees workers' compensation benefits by (1) becoming a self-insurer, (2) obtaining an insurance policy, or (3) joining with other political subdivisions to self-insure through a joint-insurance fund. TEX. LAB. CODE §§ 504.011, .016. According to its bylaws, the Risk Pool's objectives are to formulate, develop and administer a self-insurance program for its members, to obtain lower costs for workers' compensation coverage, and to develop a comprehensive safety program.

The Risk Pool charges its member cities contributions based on a "modifier system." Under this system, the Risk Pool's Board of Trustees requires its member cities to contribute a standard rate for each job classification. The cities' contributions go to a common fund, which the Risk Pool uses to pay for its member cities' workers' compensation claims and administrative expenses. The Risk Pool also invests its member cities' contributions and combines any investment returns with the existing funds available for benefits.

Every eighteen months, the Risk Pool's Board analyzes each member city's five-

year claims history to determine the future contributions the city must make. Depending on each city's claims history, the Board assigns a modifier to adjust each city's contributions. If the city's claims history is good, the Risk Pool offers a discount on contributions and returns money as "equity" to the eligible cities.

In 1997, the TWCC directed the Risk Pool to pay its unclaimed death benefits to the Subsequent Injury Fund, as Labor Code sections 403.007(a) and 408.184(c) require. The Risk Pool paid $85,000 before halting its payments. The Risk Pool then sought declaratory relief that Labor Code sections 403.007(a) and 408.184(c), and the rules the TWCC promulgated under those sections, are unconstitutional. Specifically, the Risk Pool claimed the provisions, as applied to the Risk Pool, violate Texas Constitution article III, section 52(a), which prohibits the Legislature from authorizing any state political subdivision to lend its credit or to grant public money to any individual, association or corporation. The Risk Pool also alleged the provisions, as applied to the Risk Pool, violate Texas Constitution article VIII, section 1 e, which prohibits the State from levying an ad valorem tax on any property within the State.

The trial court determined that the provisions violated both sections of the Constitution. The court of appeals reversed and rendered in the TWCC's favor. It held that the provisions are not unconstitutional because they operate like custodial-escheat statutes. 38 S.W.3d at 598. The court of appeals reasoned that because the challenged provisions only transfer custody of, and not title to, the Risk Pool's funds, the "escheat" of the unclaimed death benefits can be neither a "lending of credit" that article III, section 52(a) prohibits nor a "recapture of local taxes" that article VIII, section 1 e prohibits. 38 S.W.3d at 598.

We granted the Risk Pool's petition for review to consider: (1) whether the challenged provisions operate like custodial-escheat statutes; (2) whether the challenged provisions violate Texas Constitution article III, § 52(a); and (3) whether the challenged provisions violate Texas Constitution article VIII, § 1–e.

## II. THE SUBSEQUENT INJURY FUND

### A. THE SUBSEQUENT INJURY FUND

The Fund, originally established in 1947 as the Second Injury Fund, is a special TWCC-administered account in the state treasury. Tex. Lab.Code § 403.006(a). The Legislature established the Fund to pay lifetime workers' compensation benefits to injured employees and to encourage employers to hire people with disabilities or preexisting injuries. *Miears v. Industrial Accident Bd.*, 149 Tex. 270, 232 S.W.2d 671, 673 (1950). Under Labor Code section 402.061, which authorizes the TWCC to adopt regulations to enforce the Texas Workers' Compensation Act, the TWCC has adopted regulations to implement the Fund. 28 Tex. Admin. Code §§ 132.10–.12.

The Fund pays workers' compensation benefits when an injured employee suffers a compensable injury that, when combined with a previous injury's effects, results in a condition that entitles the employee to lifetime benefits. *See* Tex. Lab.Code § 408.162(a). Thus, if an employee suffers a subsequent compensable injury, the employer must pay benefits for that injury only to the extent that the injury would have entitled the employee to benefits had the previous injury not occurred. Tex. Lab.Code § 408.162(a). Then, the Fund pays for the claimant's remaining lifetime benefits. Tex. Lab.Code § 408.162(b).

To subsidize the Fund, Labor Code sections 403.007(a) and 408.184(c) require insurance carriers to contribute to the Fund any unclaimed death benefits not distributed under Labor Code section 408.182. *See also* 28 TEX. ADMIN. CODE § 132.10(a). Section 408.182 lists the beneficiaries eligible to receive benefits if an employee suffers a compensable injury that results in a death. TEX. LAB.CODE § 408.182; *see also* 28 TEX. ADMIN. CODE § 132.10(a). If a beneficiary on the list does not exist or does not timely claim the benefits, a workers' compensation carrier must then contribute those benefits to the Fund. TEX. LAB.CODE §§ 403.007(a); 408.182(e); *see also* 28 TEX. ADMIN. CODE § 132.10(a).

Ordinarily, a beneficiary must file a claim for death benefits within one year of an eligible employee's death. TEX. LAB. CODE § 409.007(a). If the beneficiary does not file a claim within one year, the claim is barred unless the beneficiary is a minor or incompetent or good cause exists for the beneficiary's failing to file a claim. TEX. LAB.CODE § 409.007(b). But, for purposes of financing the Fund, the Labor Code presumes that no legal beneficiary survives the employee if a death-benefits claim is not filed with the TWCC within one year of the employee's death. TEX. LAB.CODE § 403.007(c); *see also* TEX. ADMIN CODE § 132.10(h). This presumption applies unless the beneficiary is a minor or an incompetent lacking an appointed guardian. TEX. LAB.CODE § 403.007(c); *see also* TEX. ADMIN CODE § 132.10(i).

### B. STATUTORY CONSTRUCTION

■ If possible, we construe a statute in a manner that renders it constitutional and gives effect to the Legislature's intent. *See Quick v. City of Austin,* 7 S.W.3d 109, 115 (Tex.1998); *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998). We presume that the Legislature intended for the law to comply with the United States and Texas Constitutions, to achieve a just and reasonable result, and to advance a public rather than a private interest. TEX. GOV'T CODE § 311.021; *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 605 (1915). Nevertheless, the Legislature may not authorize an action that our Constitution prohibits. *See Maher v. Lasater,* 163 Tex. 356, 354 S.W.2d 923, 925 (1962); *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1009 (1934). The burden is on the party attacking the statute to show that it is unconstitutional. *See Texas Pub. Bldg. Auth. v. Mattox,* 686 S.W.2d 924, 927 (Tex. 1985).

■ In an as-applied constitutional challenge, we must evaluate the statute as it operates in practice against the particular plaintiff. *See Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 518 n. 16 (Tex.1995). In construing the statute and its effect, we consider several factors, including: the statute's purpose; the circumstances of the statute's enactment; the legislative history; common-law or former statutory provisions, including laws on the same or similar subjects; a particular construction's consequences; administrative construction of the statute; and the title, preamble and emergency provision. TEX. GOV'T CODE § 311.023; *Ken Petroleum Corp. v. Questor Drilling Corp.,* 24 S.W.3d 344, 350 (Tex.2000).

### III. CUSTODIAL ESCHEAT

The Risk Pool argues that Labor Code sections 403.007(a) and 408.184(c) are unconstitutional. It contends the challenged provisions are not analogous to a custodial-escheat statute, because the State acquires permanent control over the unclaimed benefits and does not have to return the benefits to rightful claimants whenever they appear. Moreover, the Risk Pool asserts,

the challenged provisions do not require that the TWCC publish notice to potential claimants that the State has assumed temporary custody over the benefits.

The TWCC, on the other hand, argues that the challenged provisions operate like certain Insurance Code provisions that, in requiring the State to remit unclaimed life-insurance benefits to rightful claimants, operate as custodial-escheat statutes. *Cf.* TEX. INS.CODE ART. 4.08, §§ 7, 10. The TWCC asserts that Labor Code sections 403.007(a) and 408.184(c) give the State temporary custody, not absolute title, over unclaimed benefits until beneficiaries try to recover those benefits. Therefore, the TWCC argues, these provisions do not violate the Texas Constitution.

### A. APPLICABLE LAW

■ Escheat is a procedure by which a sovereign state acquires title to abandoned property if no rightful owner appears after a specified time period. *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 240, 64 S.Ct. 599, 88 L.Ed. 692 (1944). Escheat statutes can be either absolute or custodial. *See* Comment, *Escheat in Texas: A Current Look at the Intangible Issue*, 29 Sw. L.J. 575, 577 (1975). Under absolute-escheat statutes, the state acquires title to property through operation of law or a judicial proceeding. *See Ellis v. State*, 3 Tex.Civ.App. 170, 21 S.W. 66, 66 (1893) (operation of law); TEX. PROP.CODE § 71.001(b) (judicial proceeding). In contrast, custodial-escheat statutes give the state only temporary custody over personal property until the state identifies a true owner. *See Travelers Express Co. v. Minnesota*, 506 F.Supp. 1379, 1380 n. 1 (D.Minn.1981); *TXO Prod. Corp. v. Oklahoma Corp. Comm'n*, 829 P.2d 964, 971–72 (Okla.1992). Escheat statutes, whether absolute or custodial, are constitutional if they give potential claimants notice after

the state acquires the funds and an administrative and judicial hearing to adjudicate claims. *See Connecticut Mut. Life Ins. Co. v. Moore*, 333 U.S. 541, 547, 68 S.Ct. 682, 92 L.Ed. 863 (1948). A state must also use reasonable diligence to discover the potential claimants to the property. *See Robinson v. State*, 87 S.W.2d 297, 298 (Tex.Civ.App.-El Paso 1935, writ dism'd).

### B. ANALYSIS

■ The court of appeals concluded that Labor Code sections 403.007(a) and 408.184(c) are constitutional because they permit the State to take custody of unclaimed property through an "escheat-like—or 'custodial taking'—procedure." 38 S.W.3d at 598. The court of appeals determined that the challenged provisions are analogous to article 4.08 of the Insurance Code, which, the court of appeals recognized, operates as a true custodial-escheat statute. 38 S.W.3d at 598. We disagree with this analysis.

Article 4.08 of the Insurance Code does have custodial-escheat characteristics. This provision requires the State to assume custody over unclaimed life-insurance funds for future eligible claimants' benefits, and it contains detailed notice provisions. *See* TEX. INS.CODE art. 4.08, §§ 4–7, 10. However, Labor Code sections 403.007 and 408.184 do not share these characteristics. These provisions' underlying purpose is not for the State to return unclaimed or abandoned property to any rightful claimant at any time, as a true custodial-escheat statute requires. *See Travelers Express*, 506 F.Supp. at 1380 n. 1. Instead, these provisions' purpose is to provide a means for financing the Fund so that lifetime benefits to workers with multiple injuries are available but individual employers do not have to bear this cost. TEX. LAB.CODE § 408.162. Additionally, unlike a custodial-escheat statute

that requires the State to maintain custody for an eventual rightful owner, the Labor Code presumes that no legal beneficiaries of the death benefits exist after one year. *Compare Travelers Express,* 506 F.Supp. at 1380 n. 1, *with* Tex. Lab.Code § 403.007(c), *and Industrial Accident Bd. v. Texas Employers' Ins. Ass'n,* 162 Tex. 244, 345 S.W.2d 718, 722 (1961). For all practical purposes, the State acquires title to unclaimed death benefits after one year and is not a temporary custodian for a future eligible claimant.

Accordingly, we conclude that the challenged provisions are not analogous to a custodial-escheat statute. Therefore, we disagree with the court of appeals' conclusion that the provisions are constitutional on this ground.

## IV. ARTICLE III, SECTION 52(A)

■ The Risk Pool argues that Labor Code sections 403.007(a) and 408.184(c) require it to grant public money to the Fund, which is an individual, association, or corporation. Therefore, the Risk Pool contends, the provisions violate article III, section 52(a) of our Constitution. Furthermore, the Risk Pool contends that the challenged provisions also violate this section because the Fund is not required to pay the Risk Pool's member cities the same benefits as the cities must contribute to the Fund. *See City of Tyler v. Texas Employers' Ins. Ass'n,* 288 S.W. 409 (Tex. Comm'n App.1926, judgm't adopted). The Risk Pool asserts that the Fund is constitutional only if the public money is spent for the benefit of the specific locality from which the funds originated.

In response, the TWCC argues that the Fund is a TWCC-administered special account and not an individual, association, or corporation within section 52(a)'s meaning. *See Martinez v. Second Injury Fund,* 789 S.W.2d 267, 269 (Tex.1990). Furthermore,

the TWCC argues that the Risk Pool's contributions to the Fund are not gratuitous grants of public money, because the Risk Pool's member cities receive a return benefit whenever their employees qualify for benefits from the Fund.

### A. Applicable Law

Article III, section 52(a) provides:

[T]he Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever. . . .

Tex. Const. art. III, § 52(a).

■ We have held that section 52(a)'s prohibiting the Legislature from authorizing a political subdivision "to grant public money" means that the Legislature cannot require *gratuitous* payments to individuals, associations, or corporations. *See, e.g., Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717, 740 (Tex.1995) (Edgewood IV); *Bexar County Hosp. Dist. v. Crosby,* 160 Tex. 116, 327 S.W.2d 445, 447 (1959); *Davis v. City of Lubbock,* 160 Tex. 38, 326 S.W.2d 699, 709 (1959); *Byrd v. City of Dallas,* 118 Tex. 28, 6 S.W.2d 738, 740 (1928). A political subdivision's paying public money is not "gratuitous" if the political subdivision receives return consideration. *Key v. Commissioners Ct. of Marion County,* 727 S.W.2d 667, 668 (Tex. App.-Texarkana 1987, no writ).

■ Moreover, we have determined that section 52(a) does not prohibit payments to individuals, corporations, or associations so long as the statute requiring such payments: (1) serves a legitimate public purpose; and (2) affords a clear public benefit received in return. *See Edgewood IV,* 917 S.W.2d at 740; *Bullock v. Calvert,* 480 S.W.2d 367, 370 (Tex.1972)

(citing *Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699 (1959)); *Brazos River Auth. v. Carr*, 405 S.W.2d 689, 694 (Tex. 1966); *Byrd*, 6 S.W.2d at 740. A three-part test determines if a statute accomplishes a public purpose consistent with section 52(a). Specifically, the Legislature must: (1) ensure that the statute's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment; and (3) ensure that the political subdivision receives a return benefit. *See Atkinson v. City of Dallas*, 353 S.W.2d 275, 279 (Tex.Civ.App.-Dallas 1961, writ ref'd n.r.e.); *Gillham v. City of Dallas*, 207 S.W.2d 978, 983 (Tex.Civ.App.-Dallas 1948, writ ref'd n.r.e.). *See generally* Mike Willatt, *Constitutional Restrictions on Use of Public Money and Public Credit*, 38 TEX. B.J. 413, 421 (1975).

## B. ANALYSIS

Under article III, section 52(a), the Legislature may not authorize a county, city, town or political subdivision of the State to lend credit or grant public funds. By its terms, section 52(a)'s scope includes each Risk Pool member city, and the TWCC does not dispute that Risk Pool itself qualifies as a political subdivision within section 52(a)'s meaning.

For Labor Code sections 403.007(a) and 408.184(c) to violate section 52(a), these provisions must require the Risk Pool to grant public money to "individuals, associations, or corporations." We agree with the TWCC that neither the Fund nor the TWCC qualify as an individual, association or corporation under section 52(a). The Fund is not an association; it is an account in the State treasury. *See Martinez*, 789 S.W.2d at 269. And, while section 52(a) prohibits granting public money to private

individuals or commercial enterprises, it does not prohibit transfers to a state agency like the TWCC. *See Edgewood IV*, 917 S.W.2d at 740 (citing *Byrd*, 6 S.W.2d at 740).

Although the Fund and TWCC are not individuals, associations, or corporations, the challenged provisions require the Risk Pool to indirectly transfer public funds to individuals. Specifically, the Risk Pool must transfer unclaimed death benefits to the Fund, which then pays lifetime benefits to eligible individuals. TEX. LAB.CODE § 408.162. The money does not flow to a general account, and the State Comptroller does not administer the account or treat these funds as general revenue. Rather, the TWCC's Executive Director appoints the Fund's administrator. TEX. LAB.CODE § 403.006(c). Thus, under this scheme, the Fund is a conduit through which the Risk Pool transfers public funds to individuals—subsequent-injury claimants. Accordingly, we conclude that sections 403.007(a) and 408.184(c) require the Risk Pool to pay public money to individuals within section 52(a)'s meaning.

However, we cannot conclude that the challenged provisions require the Risk Pool to "gratuitously" transfer public funds as section 52(a) prohibits. Because the Risk Pool receives consideration for its unclaimed death benefits payments to the Fund, that consideration renders the provisions constitutional because the payments are nongratuitous. *See Edgewood IV*, 917 S.W.2d at 740. The Risk Pool reads *Key v. Commissioners Court of Marion County* to require that its member cities receive equal consideration for the unclaimed death benefits they pay to the Fund. 727 S.W.2d at 669. But *Key* requires only sufficient—not equal—return consideration to render a political subdivision's paying public funds constitutional. 727 S.W.2d at 669. Here, we conclude the

Risk Pool receives enough consideration for its member cities' paying unclaimed death benefits to the Fund. Specifically, the TWCC's statutory obligation to pay lifetime benefits from the Fund to any Risk Pool member city's employee who suffers a subsequent injury and qualifies for these benefits is consideration. Consequently, the Risk Pool member cities' unclaimed death benefits payments to the Fund are not gratuitous.

Additionally, paying unclaimed death benefits to the Fund accomplishes a legitimate public purpose. *See Edgewood IV*, 917 S.W.2d at 740; *Bullock*, 480 S.W.2d at 370. In determining that the Fund accomplishes a legitimate public purpose, we apply the three-part test. *See Atkinson*, 353 S.W.2d at 279; *Gillham*, 207 S.W.2d at 983. *See generally* Willatt, 38 Tex. B.J. at 421. First, the challenged provisions' predominant purpose is to provide lifetime workers' compensation benefits for Texas employees with subsequent compensable injuries. Thus, employers would not have to pay higher workers' compensation rates for hiring disabled employees and would not be discouraged from hiring such employees. *Miears*, 232 S.W.2d at 673. Second, the TWCC retains exclusive control over the unclaimed death benefits to fulfill the Fund's objectives. *See* Tex. Lab.Code 408.162. Third, as we already concluded, the Risk Pool's member cities receive a direct reciprocal benefit from the Fund.

Paying unclaimed death benefits to the Fund also provides a clear public benefit. *See Edgewood IV*, 917 S.W.2d at 740; *Bullock*, 480 S.W.2d at 370. The Fund ensures that employers do not deny employment to individuals with preexisting injuries because they fear that later injuries will expose them to greater liability. *See Miears*, 232 S.W.2d at 673. The Fund—by expanding Texas' workforce, placing disabled workers on a more equal plane as compared to other workers, and lowering workers' compensation rates—benefits the public as a whole, and not merely a particular private interest. Therefore, we conclude that Labor Code sections 403.007(a) and 408.184(c) accomplish a legitimate public purpose with a clear public benefit received in return.

We disagree with the Risk Pool's argument that the Fund is analogous to mutual assessable insurance programs that the Attorney General has opined, and a Texas court has held, to be unconstitutional under section 52(a). *See City of Tyler*, 288 S.W. at 412; Op. Tex. Atty. Gen. No. DM–326. In AG Opinion DM–326, the Attorney General discussed whether proposed legislation creating an association that would pay workers' compensation claims for political subdivisions was constitutional. Op. Tex. Atty. Gen. No. DM–326 at 3424. Because political subdivisions' membership would be mandatory, and the association would derive its funding through assessments imposed on its members, the Attorney General concluded that the proposed association would violate section 52(a). Op. Tex. Atty. Gen. No. DM–326 at 3424–26.

In reaching this conclusion, the Attorney General noted that the proposed association would operate like a mutual assessable insurance program in which subscribers contribute payments for all subscribers' losses and expenses. Op. Tex. Atty. Gen. No. DM–326 at 3425. Such programs do not calculate payments based on each subscriber's actual expense and loss experience, because each subscriber acts as both an insured and insurer for the other subscribers. Op. Tex. Atty. Gen. No. DM–326 at 3426. The Attorney General suggested that if the proposed association calculated payments based on the subscribers' actual claims history, the association would have self-insurance characteristics and, there-

fore, would be constitutional under section 52(a). Op. Tex. Atty. Gen. No. DM–326 at 3426.

In *City of Tyler*, the court considered whether a statute that authorized public employers to subscribe to the Texas Employers' Insurance Association was constitutional. 288 S.W. at 409. The court concluded that the TEIA was a mutual assessable insurance program, because every TEIA subscriber had to pay a proportionate part of any assessment the TEIA levied to finance all the subscribers' losses and expenses. *City of Tyler*, 288 S.W. at 411–12. The court held that this scheme was unconstitutional as applied to political subdivisions because their obligation to pay assessments to cover the TEIA's losses required them to "lend their credit" within section 52(a)'s meaning. *City of Tyler*, 288 S.W. at 412. Moreover, the court held that the TEIA unconstitutionally required political subdivisions to become "stockholders in a corporation, association, or company," which section 52(a) also prohibits. *City of Tyler*, 288 S.W. at 412.

Both AG Opinion DM 326 and *City of Tyler* determined that the insurance programs in those cases operated as mutual assessable insurance programs. Essentially, these programs require their subscribers to pay assessments to the association to insure other subscribers' losses, while at the same time, the subscribers can make claims against the association's funds for their own losses. *See also* TEX. INS. CODE art. 14.11; *Hutchins Mut. Ins. Co. v. Hazen*, 105 F.2d 53, 57 (D.C.Cir.1939); COUCH ON INSURANCE 3d § 39:17, at 39–21. Each subscriber is charged the same assessment for insurance coverage; thus, each subscriber's policy is to some extent a coverage contract with every other subscriber. *See Johnson v. Central Mut. Ins. Ass'n*, 346 Mo. 818, 143 S.W.2d 257, 262

(1940). Moreover, each subscriber participates equally in the association's profits and losses. *See Ohio Farmers Indem. Co. v. Commissioner*, 108 F.2d 665, 667 (6th Cir.1940); *Equitable Life Assurance Soc. v. Bowers*, 87 F.2d 687, 689 (2d Cir.1937).

Here, unlike mutual assessable insurance programs, the Fund is an account under the TWCC's control financed with unclaimed death benefits. The Fund does not impose assessments on the Risk Pool's member cities. *Cf.* Op. Tex. Atty. Gen. No. DM–326 at 3424–26. The member cities do not pay a proportional share of the Fund's losses and expenses, and they do not have to make equal payments to the Fund under an insurance policy. *Cf. City of Tyler*, 288 S.W. at 411–12. Indeed, if a member city has no unclaimed death benefits in a particular year, it contributes no money whatsoever to the Fund. Moreover, the Fund is not a company or association and does not enroll policyholders. *Cf. Ohio Farmers*, 108 F.2d at 667; *Equitable Life*, 87 F.2d at 689. In fact, the Fund has no "members" at all. Therefore, we conclude that the Fund is not an unconstitutional mutual assessable insurance program.

We conclude that the challenged provisions do not require the Risk Pool to gratuitously grant public money, because the Risk Pool's member cities receive consideration from the Fund, and the provisions serve a legitimate public purpose with a clear public benefit. *See Edgewood IV*, 917 S.W.2d at 740. Accordingly, we hold that Labor Code sections 403.007(a) and 408.184(c), as applied to the Risk Pool, do not violate article III, section 52(a).

## V. ARTICLE VIII, SECTION 1–e

The Risk Pool argues that Labor Code sections 403.007(a) and 408.184(c) violate the Texas Constitution, article VIII, section 1–e, because the provisions effectively

levy a 100% ad valorem tax on property—in this case unclaimed death benefits. The Risk Pool also argues that the challenged provisions unconstitutionally authorize the State to recapture local tax dollars and redistribute them statewide.

The TWCC, on the other hand, contends that the payments to the Fund are not "taxes" at all. Thus, the TWCC argues, the challenged provisions do not authorize the State to levy ad valorem taxes within section 1–e's meaning. Moreover, the TWCC contends that the challenged provisions do not require the State to unconstitutionally recapture local ad valorem tax revenues for statewide use.

### A. Applicable Law

The Texas Constitution generally authorizes taxes on property in proportion to the property's value. Tex. Const. art. VIII, § 1(b). However, our Constitution prohibits the State from levying an ad valorem tax on any property within the State. Tex. Const. art. VIII, § 1–e. The Legislature defines a state "tax" as "a tax, fee, assessment, charge, or other amount that the comptroller is authorized to administer." Tex. Tax Code § 101.003(13); see also Conlen Grain & Mercantile, Inc. v. Texas Grain Sorghum Producers Bd., 519 S.W.2d 620, 623 (1975) ("A tax is a burden or charge imposed by the legislative power of the state upon persons or property to raise money for public purposes."). The Risk Pool alleges that the TWCC, through the Subsequent Injury Fund, imposes a state "tax."

■■■■ Moreover, an "ad valorem" tax is a tax on property at a certain rate based on the property's value. See generally 71 Am.Jur.2d State & Local Taxation § 20 (1973). An ad valorem tax is a prohibited tax under section 1–e when the State directly imposes it, or when a political subdivision imposes it but the State

indirectly controls the tax revenues' levy, assessment, and disbursement so that the political subdivision lacks any meaningful discretion over these factors. See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489, 502 (Tex.1992) (Edgewood III).

### B. Analysis

■■■■ We agree with the Risk Pool's argument that the unclaimed death benefits are "property" under article VIII, section 1–e. The Tax Code defines "property" as "any matter or thing capable of private ownership." Tex. Tax Code § 1.04(1). Additionally, "intangible personal property" means a claim, right, or interest that has value but cannot be measured or perceived by the senses and includes an insurance policy, annuity, or pension. Tex. Tax Code § 1.04(6). Here, the unclaimed death benefits are capable of private ownership, because there may be beneficiaries who can claim title to the funds. See Tex. Lab.Code § 408.182; Tex. Tax Code § 1.04(1). Furthermore, the Tax Code expressly includes an insurance policy, annuity or pension as intangible personal property. Tex. Tax Code § 1.04(6); see also Brown v. Lee, 371 S.W.2d 694, 696 (Tex.1963). Workers' compensation death benefits are analogous to life-insurance proceeds, because an employee's beneficiaries receive those benefits upon an employee's compensable death. Compare Tex. Lab.Code § 408.182, with Supreme Council of Am. Legion of Honor v. Larmour, 81 Tex. 71, 16 S.W. 633, 634 (1891) (life insurance beneficiaries receive money "upon the destruction or injury of something in which the assured has an interest."). Therefore, the unclaimed death benefits are "property" within section 1–e's meaning.

However, the challenged provisions are not a "tax" on the unclaimed death bene-

fits. First, the challenged provisions are not a state "tax" as the Tax Code defines that term, because they do not authorize the comptroller to impose a fee, assessment, or charge. TEX. TAX CODE § 101.003(13). Second, the challenged provisions do not mandate that the Risk Pool or its member cities collect charges from property-owners to generate revenue. *See Conlen Grain*, 519 S.W.2d at 622–23 (holding that the statute at issue imposed a "tax" because it mandated that grain sorghum processors collect fees from producers for every .5 ton of grain produced). Rather, the challenged provisions only transfer unclaimed benefits that the Risk Pool's member cities have already committed to paying workers' compensation claims. *See* TEX. LAB.CODE §§ 408.181, 408.182.

Finally, the challenged provisions do not permit the State to indirectly control the levy, assessment, and disbursement of the Risk Pool member cities' tax revenues. *Edgewood III*, 826 S.W.2d at 502. Indeed, the challenged provisions do not enable the State to participate in any way in the cities' local taxing decisions. Therefore, we conclude that the State does not impose a tax to subsidize the Fund.

Because we conclude that the challenged provisions do not authorize a "tax," article VIII, section 1–e is not implicated. Consequently, we hold that the challenged provisions, as applied to the Risk Pool, do not violate article VIII, section 1–e.

## VI. CONCLUSION

We hold that Labor Code sections 403.007(a) and 408.184(c), and the TWCC regulations implementing these provisions, are not analogous to custodial-escheat stat-

utes. We further hold that these provisions, as applied to the Risk Pool, do not violate article III, section 52(a), or article VIII, section 1–e of the Texas Constitution. Accordingly, we affirm the court of appeals' judgment.

Justice OWEN filed a dissenting opinion, in which Justice HECHT joined.

Justice OWEN, joined by Justice HECHT, dissenting.

This is a suit by the Texas Municipal League Intergovernmental Risk Pool, which is comprised of approximately 1600 cities and other political subdivisions that have chosen to collectively self-insure to provide workers' compensation insurance, against the Texas Workers' Compensation Commission and the Subsequent Injury Fund. The Municipal Risk Pool contends that two sections of the Texas Labor Code [1] and certain administrative rules [2] that implement those Code sections are unconstitutional as applied to political subdivisions. The challenged Code provisions deal with the payment of death benefits when there is no legal beneficiary, a claim for death benefits is not timely made, or all legal beneficiaries cease to be eligible before 364 weeks of benefits have been paid. The Code provisions require all workers' compensation insurance carriers, including the Municipal Risk Pool, to pay these death benefits to the Workers' Compensation Commission for deposit into the Subsequent Injury Fund. [3] The Fund then distributes these funds 1) to workers across the state who receive a second injury that, combined with the effects of a prior injury, entitles the employee to life-

---

1. TEX. LAB.CODE §§ 403.007(a), 408.184(c).

2. TEX. ADMIN. CODE §§ 132.10, 132.11, 132.12 (2000).

3. TEX. LAB.CODE §§ 403.007(a), 408.184(c).

time benefits,[4] and 2) to compensate insurance carriers that were required by the Commission to pay benefits when it is later determined that those benefits were not owed.[5] In the absence of these Code provisions, insurance carriers, including the Municipal Risk Pool, would retain the funds when there is no legal beneficiary to receive death benefits.

The Municipal Risk Pool contends, and the trial court held, that these Code provisions violate article III, section 52(a) of the Texas Constitution as applied to political subdivisions. This section of the constitution provides in relevant part:

[T]he Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company. However, this section does not prohibit the use of public funds or credit for the payment of premiums on nonassessable property and casualty, life, health, or accident insurance policies and annuity contracts issued by a mutual insurance company authorized to do business in this State.[6]

The court of appeals reversed the trial court, and the Court today affirms that judgment, although on different grounds. Because I agree with the trial court that the challenged Code provisions and administrative regulations violate article III, section 52(a), I respectfully dissent. The payment of the death benefits to the Commission is not actuarially based. The fact that payments could be made from the Subsequent Injury Fund to employees of a political subdivision does not save the current scheme. This Court has held repeatedly that article III, section 52(a) prohibits the Legislature from directing a political subdivision to make *any* payment to an individual or private corporation unless that governmental entity has an independent legal obligation to make that payment. The Code sections at issue in this case require political subdivisions of the State to grant public money to individuals (workers) for injuries for which the political subdivision has no responsibility or liability, and the Code requires political subdivisions to compensate private corporations (insurance carriers) for losses that have no relation whatsoever to the political subdivisions. Even though the Subsequent Injury Fund serves legitimate needs and indirectly benefits the public, article III, section 52 prohibits the Legislature from directing political subdivisions to contribute to that fund.

This case is governed by the decision in *City of Tyler v. Texas Employers' Insurance Association.*[7] The question in that case was whether a city could become a subscriber under the former Workmen's Compensation Act. The answer was that it could not because under that Act, an employee would be compensated for an on-the-job injury even though there was no negligence or other culpability on the part of the government employer. The court in *City of Tyler* explained that the purpose of article III, section 52 of the Texas Constitution is to "prevent the gratuitous appropriation of public money or property."[8] It continued, "a grant in aid of or to any individual, association, or corporation

---

4. *Id.* § 408.162.

5. *Id.* § 410.032(b).

6. Tex. Const. art. III, § 52(a).

7. 288 S.W. 409 (Tex. Comm'n App.1926, judgm't adopted).

8. *Id.* at 412.

whatsoever [9] is not one of these purposes, but is expressly forbidden." It did not matter that the premiums a city paid would also cover on-the-job injuries caused by its own negligence for which it would be legally liable under the common law or statutes. The fact that under the Act, employees would also be compensated for injuries for which a city had no legal liability was enough to render participation by a city in the workmen's compensation scheme unconstitutional:

> When the Workmen's Compensation Law is analyzed and fully understood, it is clear that to permit a municipal corporation to become a subscriber to the insurance association therein provided authorizes it to grant public money by way of premiums for insurance in aid of its employés to whom it is under no legal liability to pay. As already pointed out, the act contemplates compensation in the absence of any legal liability other than the acceptance of the plan. Cities and towns have no power to appropriate the tax money of its citizens to such a purpose. It is at best a gratuity, a bonus to the employé. The city might as well pay his doctor's fee, his grocer's bill, or grant him a pension.[10]

Accordingly, even though a city would receive some consideration for the premiums it paid, which was the coverage of claims by its employees for which it was liable under the common law or statutes, that consideration did not render participation in the Workmen's Compensation Act scheme constitutional.

The Texas Constitution has since been amended, in article III, section 60, to permit cities and other political subdivisions of the state to provide workers' compensation insurance or to provide their own insurance risk to "employees of the political subdivision." [11] Accordingly, a political subdivision is no longer prohibited from obtaining or providing workers' compensation benefits to its own employees for injuries for which it would not be legally liable. But that amendment does not permit a political subdivision to fund compensation coverage for employees of other political subdivisions, much less workers in the private sector. And section 60 does not permit a political subdivision to compensate private insurance carriers for losses they sustain.

The core holding in *City of Tyler* remains intact. Political subdivisions have no common-law or contractual obligation to

---

9. *Id.*

10. *Id.*

11. Article III, section 60, adopted in 1948, allowed counties to provide workmen's compensation insurance; as amended in 1962, it permitted political subdivisions to cover employees. In 1952, with the adoption of article III, section 61, coverage could be provided to employees of cities, towns, and villages. *See* Tex. Const. art. III §§ 60, 61 interp. commentary. Constitutional amendments adopted in 2001 consolidated sections 60 and 61 into former section 60 and repealed section 61. Section 60 now provides:

§ **60. Workers' Compensation Insurance for employees of counties and other political subdivisions**

Sec. 60. The Legislature shall have the power to pass such laws as may be necessary to enable all counties, cities, towns, villages, and other political subdivisions of this State to provide Workers' Compensation Insurance, including the right of a political subdivision to provide its own insurance risk, for all employees of the political subdivision as in its judgment is necessary or required; and the Legislature shall provide suitable laws for the administration of such insurance in the counties, cities, towns, villages, or other political subdivisions of this State and for the payment of the costs, charges and premiums on such policies of insurance and the benefits to be paid thereunder.

provide benefits to workers other than their own employees or to remunerate private carriers who were required by the Commission to pay benefits for a period of time even though the worker's injury was not compensable. The Legislature is prohibited by section 52(a) from authorizing or requiring a political subdivision to divert public funds for these purposes.

The Court says today that as long as a political subdivision receives "sufficient" consideration, even though it is not "equal" to what that political subdivision pays, then the paying out of public funds is constitutional.[12] For this proposition, the Court cites *Key v. Commissioners Court of Marion County*,[13] a per curiam opinion of a court of appeals that was never reviewed by this Court. But even that meager authority does not support the Court's conclusion. The court of appeals in *Key* held that a state-created agency could not transfer complete control of the "Christmas Candlelight Tour" or the publication of an historical periodical to a tax-exempt charitable organization. The court reasoned that these projects were "things of value."[14] During the course of its discussion, the court of appeals distinguished cases in which a state entity had contractually retained the services of a private business:

> Each case cited is readily distinguishable from the present situation. These cases involve contractual agreements for services or property entered into by a governmental arm with private business. In this case we have no such contractual obligation and no retention of formal control. Had the Historic Jefferson Foundation obligated itself contractually to perform a function beneficial to the

public, this obligation might be deemed consideration, and where sufficient consideration exists, Article III, § 52(a) of the Texas Constitution would not be applicable to the transaction.[15]

In the case before us today, political subdivisions are required to transfer funds that will be used to pay for injuries for which the political subdivisions have no liability. The funds will also be used to compensate private corporations for losses for which the political subdivisions have no liability. The fact that in some cases, employees of a political subdivision may also be compensated does not render this scheme constitutional. Any compensation that may flow to a particular employee of a political subdivision is unlikely to be proportionate to the political subdivision's contribution to the Subsequent Injury Fund. And, in some instances, a political subdivision may make payments to the fund even though none of its employees receive benefits. Moreover, a political subdivision receives no benefit whatsoever from compensating private insurance carriers from the Subsequent Injury Fund.

The difference between the Subsequent Injury Fund scheme and the self-insurance functions of the Risk Pool is that assessments on each political subdivision for its share of the self-insurance fund are based on each political subdivision's actual claims experience. They pay no more than their share of the actual claims for which they are legally liable. The opinion of the attorney general cited by the Court explains why a political subdivision cannot constitutionally participate in a workers' compensation scheme that is based on assessments that are not tied to each political

---

12. 74 S.W.3d at 385.

13. 727 S.W.2d 667 (Tex.App.-Texarkana 1987, no writ).

14. *Id.* at 669.

15. *Id.*

subdivision's actual claims history.[16] The reasoning in that opinion applies with equal force to the facts in this case.

Finally, the Court's opinion could be read as holding that as long as public money is expended for a public purpose, public money can be given, gratuitously, to an individual or a private corporation. The opinion should not be construed so broadly. I believe that what the Court meant to say, but has not done so as clearly as it could, is that a political subdivision may make expenditures for goods or services or for compensating those that are injured by its actionable negligence as long as those expenditures serve a legitimate public purpose. The Court cites *Edgewood Independent School District v. Meno*,[17] in concluding that the payments of unclaimed death benefits at issue in this case "provide[ ] a clear public benefit."[18] But in *Edgewood*, the Legislature required payments to be made by one political subdivision (a school district) to another for public education. That case does not stand for the proposition that public funds can be funneled to an individual or a private corporation so long as the public interest is somehow furthered.

When individuals or private entities receive public funds, it must be pursuant to a contract or in satisfaction of an obligation the political subdivision owes to the individual or private entity. None of the 1600 political subdivisions that form the Risk Pool have any contractual or other obligation to workers other than their own respective employees, nor do they have any obligation or even any remote connection with the private insurance carriers

who are reimbursed from the Subsequent Injury Fund.

\*　\*　\*　\*　\*　\*

The Subsequent Injury Fund serves laudable purposes. However, as currently structured, the means of funding it is unconstitutional as applied to political subdivisions. Accordingly, I must dissent.

---

16. Op. Tex. Atty. Gen. No. DM–326 at 1728 (1995) (reasoning that an assessment policy scheme would violate article III, section 52(a) of the Texas Constitution because it would "constitute an unconstitutional lending of credit," and membership would be "tanta-

mount to holding stock in a corporation, association or company").

