ATTORNEY GENERAL OF TEXAS

GREG ABBOTT

June 30, 2003

The Honorable Scott Sherwood
Carson County Attorney
303 Euclid Avenue
P.O. Box 947
Panhandle, Texas 79068-0947

Opinion No. GA-0084

Re: City of Skellytown's authority to enter certain agreements with the Skellytown Area Volunteer Firefighters-EMS Association (RQ-0014-GA)

Dear Mr. Sherwood:

On behalf of the City of Skellytown (the "City"), you submit three questions about the City's authority to adopt a resolution concerning the Skellytown Area Volunteer Firefighters-EMS Association (the "Association"), a nonprofit corporation incorporated on April 3, 2000,[1] and enter into a lease agreement with the Association.

I.      **Background**

At a special meeting on May 3, 2000, the Skellytown City Council (the "Council") approved two agreements concerning the City's relationship with the Association:

     1. Resolution No. 2000-01, by which the City transferred to the Association "all contracted and dedicated funds, existing [g]overnmental budgets, and [b]ank [a]ccounts previously designated for use by the Skellytown Volunteer Fire-EMS Department." Resolution No. 2000-01, Skellytown City Council (May 3, 2000), attached to Request Brief, *supra* note 1; *see also* Skellytown City Council Special Council Meeting Minutes (May 3, 2000), attached to Request Brief, *supra* note 1.

     2. Ratification of Titles, Lease of Facilities and Conveyance of Interest in Realty and Personalty, under which the Council transferred to the Association (a) "[t]he use of titles and all incidences of ownership . . . [for an annual lease payment of $1.00] for a period of 10 years in the buildings, housing and related facilities located at 412 Main Street," in addition to "the buildings housing existing fire equipment located at 204 Fourth Street . . ., but excluding one bay purchased and

---

[1]*See* Brief accompanying Letter from Honorable Scott Sherwood, Carson County Attorney, to Honorable Greg Abbott, Texas Attorney General, at 1-2 (Jan. 30, 2003) (on file with Opinion Committee) [hereinafter Request Brief].

exclusively reserved by [the City] for its use," and (b) "[a]ll property, associated equipment, furniture and personalty related to the existing [f]ire-[f]ighting and EMS facilities, including . . . radio equipment and antennae or other communication equipment." Ratification of Titles, Lease of Facilities, and Conveyance of Interest in Realty and Personalty, §§ I-II, at 1-2, attached to Request Brief, *supra* note 1 [hereinafter Ratification and Lease]. The Ratification and Lease also reserved to the Association "[t]he use of antennae space and the existing water tower and all assigned radio frequencies or other communication spectrums." *Id.* § III, at 2.

On May 2, 2000, the day prior to the Council meeting, the City mayor, acting on the City's behalf, and the Association's fire chief executed an Agency Agreement Between City of Skellytown and the Association,[2] which contained five covenants:

1. The City designated the Association as the City's agent to provide City inhabitants with "fire protection and other emergency services."

2. The City retained "the right to supervise and control" the Association's "duties and activities" performed on the City's behalf. Additionally, the City designated the fire chief "as its agent for the purpose of day-to-day management and supervision of the Department."

3. "The agency relationship" established under this agreement "shall continue until either party terminates the agency relationship by sixty . . . days written notice to the other party."

4. "The real and personal property owned by the Volunteer Fire Department [f]or providing fire protection and other emergency services are being used by and are intended to be used by the [City] for fire protection and other emergency services. Such property is considered to be leased to or borrowed by the [City] for fire protection and other emergency services."

5. The Association "allow[ed]" the City "to continue to collect the $1.50 monthly fee attached to the water bills," which the Association agreed "to accept . . . for insurance and upkeep of the [City-]owned municipal pumper."[3]

For brevity's sake, we will refer to all three of these documents collectively as the "Agreements."

---

[2]*See* Agency Agreement Between City of Skellytown and Skellytown Area Volunteer Firefighters-EMS Ass'n (May 2, 2000), attached to Request Brief, *supra* note 1, at 1-2 [hereinafter Agency Agreement].

[3]*See id.* at 1-2.

## II.    Presumed Validity of City's Actions

Section 51.003 of the Local Government Code requires us conclusively to presume the validity of the Council's actions that occurred over three years ago in certain circumstances:

(a) A governmental act or proceeding of a municipality is conclusively presumed, as of the date it occurred, to be valid and to have occurred in accordance with all applicable statutes and ordinances if:

(1) the third anniversary of the effective date of the act or proceeding has expired; and

(2) a lawsuit to annul or invalidate the act or proceeding has not been filed on or before that third anniversary.

(b) This section does not apply to:

(1) an act or proceeding that was void at the time it occurred;

(2) an act or proceeding that, under a statute of this state or the United States, was a misdemeanor or felony at the time the act or proceeding occurred;

(3) an incorporation or attempted incorporation of a municipality . . . ;

(4) an ordinance that, at the time it was passed, was preempted by a statute of this state or the United States . . . ; or

(5) a matter that on the effective date of this section:

(A) is involved in litigation . . . ; or

(B) has been held invalid by a final judgment of a court.

TEX. LOC. GOV'T CODE ANN. § 51.003 (Vernon Supp. 2003). While section 51.003 does not absolutely validate all past municipal actions, it provides "some defense" to an action that, although valid and within a city's authority to enact, was "enacted incorrectly from a procedural or clerical standpoint." HOUSE COMM. ON URBAN AFFAIRS, BILL ANALYSIS, Tex. H.B. 485, 76th Leg., R.S. (1999).

Given that the Council approved the Agreements in question on May 3, 2000—over three years ago—and that no litigation has been filed concerning their validity, the Agreements are valid

unless any of the conditions specified in subsection (b) apply. Under the facts the City has provided, only subsections (b)(1) and (b)(2) must be addressed. Consequently, we examine the issues you raise only to determine whether the Agreements are void *ab initio* or whether the Council's actions in adopting the Agreements constitute a criminal violation.

### III.    Dual Officeholding, Incompatibility, and Conflict of Interest

At the time of the May 3, 2000 meeting, one Council member also served as the Association's EMS director and, as such, a member of the Association's board of directors.[4] He held his Council position prior to the Association's incorporation, at which time he was named an "initial" director of the Association.[5] The Council member voted on all of the matters concerning the Association that were before the Council at the meeting. *See* Request Brief, *supra* note 1, at 1-2. Given his dual capacity as a Council member and an Association trustee, the City is concerned about the Agreements' validity.

Accordingly, the City asks first about the "legal consequences of an individual serving simultaneously on the . . . Council and Board of Directors of the Association and voting on" the resolution transferring numerous City assets to the Association. *See* Request Brief, *supra* note 1, at 1. You are particularly concerned about the common-law doctrine of incompatibility, but the constitutional prohibition on dual officeholding and statutory conflict-of-interest restrictions also must be considered. Restrictions that the municipal oath of office, the City charter, or City ordinances may place on dual service or conflict of interest may apply, too, and you should consider whether, under any of these, the Agreements are void *ab initio*; we do not consider these documents here. *See* Tex. Att'y Gen. Op. No. JC-0143 (1999) at 3 ("In deference to city officials, this office does not generally construe city charters or ordinances."); *see, e.g.*, TEX. LOC. GOV'T CODE ANN. § 171.007(b) (Vernon 1999) (stating that Local Government Code chapter 171, which regulates conflicts of interest, "is cumulative of municipal charter provisions and municipal ordinances defining and prohibiting conflicts of interest").

### A.    Dual Officeholding

Article XVI, section 40 of the Texas Constitution, which prohibits a person from simultaneously holding more than one "civil office of emolument," does not apply. TEX. CONST. art. XVI, § 40. Although the Council member serves as both a volunteer emergency medical technician and an Association director, neither of these positions are offices for constitutional purposes. *See* Tex. Att'y Gen. Op. Nos. JC-0385 (2001) at 1-2; JC-0199 (2000) at 1; *cf.* Tex. Att'y Gen. Op. No. DM-303 (1994) at 1 (stating that executive director of nonprofit housing corporation is not an officer for purposes of article XVI, section 40).

---

[4]*See* Articles of Incorporation of Skellytown Area Volunteer Firefighters-EMS Ass'n, art. IX, at 5 (Apr. 3, 2000), attached to Request Brief, *supra* note 1.

[5]*Id.* art. IX, at 4 (Apr. 3, 2000); Telephone conversation with James T. Shelton, Skellytown City Attorney (May 21, 2003) (stating that Council member was appointed to office in March 1999).

## B.     Incompatibility

The common-law doctrine of incompatibility is "not a single doctrine," but comprises three aspects:  (1) conflicting loyalties; (2) self-appointment; and (3) self-employment.  Tex. Att'y Gen. Op. No. JC-0564 (2002) at 1-2; *see also* Tex. Att'y Gen. Op. No. JC-0199 (2000) at 1. Conflicting-loyalties incompatibility applies only to the holding of two public offices.  *See Thomas v. Abernathy County Indep. Sch. Dist.*, 290 S.W. 152, 153 (Tex. Comm'n App. 1927, judgm't adopted); Tex. Att'y Gen. Op. No. GA-0015 (2003) at 1-2.  Because a director of a volunteer fire department is not a public officer, conflicting-loyalties incompatibility does not apply here.

Self-appointment and self-employment incompatibility preclude an officer from being appointed to or employed in a position over which the officer has appointment or employment authority.  *See Ehlinger v. Clark*, 8 S.W.2d 666, 674 (Tex. 1928).  Determining whether either self-appointment or self-employment incompatibility applies to a member or a director of a volunteer fire fighters association traditionally requires an analysis of the municipal charter or the association's articles of incorporation or bylaws to ascertain the degree of control the municipality has over the association.  For example, where a city charter authorizes the fire chief to appoint fire fighters without city approval, a city council member is not precluded from appointment to the fire department. *See* Tex. Att'y Gen. Op. No. JC-0199 (2000) at 1.  Similarly, where a municipality does not own, control, or supervise a volunteer fire department, a member is not precluded from serving on the city council.  *See* Tex. Att'y Gen. Op. No. JC-0385 (2001) at 2; Tex. Att'y Gen. LO-94-070, at 2.  If the facts indicate that an appointment or employment is incompatible with an office already held, the appointment or employment is void.  *See* Tex. Att'y Gen. Op. No. JC-0455A (2002) at 2.

The materials you have submitted suggest, but do not demonstrate conclusively, that the City had little control over the Association at the time the Agreements were executed.  For example, under the Association's bylaws, its members elect directors from among themselves; thus, the City has no role in appointing the fire chief, assistant fire chief, fire captains, and ambulance director.[6] Nonetheless, the Agency Agreement reserves to the City "the right to supervise and control the duties and activities of the Volunteer Fire Department performed on" the City's behalf.[7]

Even if the City retained sufficient control over the Association so that the Council member's dual positions are incompatible, however, the Agreements are not void.  *See* TEX. LOC. GOV'T CODE ANN. § 51.003(b)(1) (Vernon Supp. 2003).  The effect of any incompatibility is to void the Council member's acceptance of a position on the Association's board of directors.  *See* Tex. Att'y Gen. Op. No. JC-0455A (2002) at 2.  Accordingly, his votes as a member of the Council were valid.[8]

---

[6]*See* By-Laws of Skellytown Area Volunteer Firefighters-EMS Ass'n, art. III, §§ 3.01-3.04, at 2, attached to Request Brief, *supra* note 1.

[7]Agency Agreement, *supra* note 2, at 1 (covenant 2).

[8]Section 21.002 of the Local Government Code, which became effective May 3, 2001, does not apply to this city council meeting, which occurred a year to the day before section 21.002's effective date. *See* Act of Apr. 20, 2001,

(continued...)

## C.     Conflict of Interest

Although the Council member's position on the City Council on May 3, 2000 is not in doubt, he was required to comply with any applicable conflict-of-interest provision set forth in chapter 171 of the Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. § 171.001(1) (Vernon 1999) (defining the term "local public official"). *See generally id.* ch. 171 (Vernon 1999) ("Regulation of Conflicts of Interest of Officers of Municipalities, Counties, and Certain Other Local Governments").[9]

Section 171.004 generally prohibits a local official, including a city council member, from participating in a matter involving a business entity, including a nonprofit corporation, in which the official has a substantial interest if the matter will "have a special economic effect on the business entity that is distinguishable from the effect on the public." *Id.* § 171.004(a)(1); *see id.* § 171.001(2) (defining the term "business entity"); *see also* Tex. Att'y Gen. Op. No. DM-303 (1994) at 3 (concluding that a nonprofit corporation is a business entity for chapter 171's purposes). An official has a substantial interest in a business entity if, in the previous year, he or she received more than ten percent of his or her gross income from the business entity. *See* TEX. LOC. GOV'T CODE ANN. § 171.002(a)(2) (Vernon 1999). A local official who has such a substantial interest must "file . . . an affidavit stating the nature and extent of the interest and . . . abstain from" participating further in the matter. *Id.* § 171.004(a). *But see id.* § 171.004(c) (excepting an official from the abstention requirement if a majority of the governmental body's members are likewise required to file affidavits on the same issue). Given that the Ratification and Lease required the City to lease certain buildings

---

[8](...continued)
77th Leg., R.S., ch. 42, § 3, 2001 Tex. Gen. Laws 73, 73; Tex. Att'y Gen. Op. No. JC-0564 (2002) at 3; Skellytown City Council Special Council Meeting Minutes (May 3, 2000), attached to Request Brief, *supra* note 1. Section 21.002 expressly authorizes a member of a municipal governing body to volunteer in certain organizations only if the governing body officially permits the service:

> A member of the governing body of a municipality may serve as a volunteer for an organization that protects the health, safety, or welfare of the municipality regardless of whether the organization is funded or supported in whole or part by the municipality if the governing body adopts a resolution allowing members of the governing body to perform service of that nature.

TEX. LOC. GOV'T CODE ANN. § 21.002 (Vernon Supp. 2003). Section 21.002 preempts the common-law incompatibility doctrine "with regard to that aspect of self-employment involving dual service on city councils and volunteer fire departments. . . . [D]ual service in those specific instances is necessarily prohibited *unless* a city council adopts the kind of resolution" section 21.002 describes. Tex. Att'y Gen. Op. No. JC-0564 (2002) at 4. Currently, therefore, neither the Council member being discussed here nor any other Council member currently may serve as "a volunteer for an organization that protects the health, safety, or welfare of the municipality," TEX. LOC. GOV'T CODE ANN. § 21.002 (Vernon Supp. 2003), unless the City has adopted a resolution under section 21.002, but no such resolution was necessary on May 3, 2000.

[9]The Association's bylaws regulate conflicts of interest, but the conflict-of-interest provision pertains solely to a financial transaction between the Association and an Association director, officer, or member. *See* By-Laws of Skellytown Area Volunteer Firefighters-EMS Ass'n, art. VII, § 7.05, at 7, attached to Request Brief, *supra* note 1. It does not apply here.

to the Association for an annual lease payment of $1 and authorized the City to collect a fee with utility payments to give to the Association, the Council's actions on May 3, 2000 may be found to have a "special economic effect" on the Association for purposes of section 171.004. *Id.* § 171.004(a)(1); *see also* Tex. Att'y Gen. Op. No. DM-279 (1993) at 7 (stating that this office ordinarily does not decide whether a particular action will have a special economic effect on a particular entity).

An uncompensated director of a nonprofit corporation does not have a substantial interest in the corporation for purposes of section 171.004 and is, therefore, not required to comply with section 171.004's affidavit and abstention requirements. *See* Tex. Att'y Gen. Op. No. GA-0068 (2003) at 3-4. Section 171.009 expressly permits a local public official to serve as an uncompensated director of a private nonprofit corporation: "It shall be lawful for a local public official to serve as member of the board of directors of private, nonprofit corporations when such officials receive no compensation or other remuneration from the nonprofit corporation or other nonprofit entity." TEX. LOC. GOV'T CODE ANN. § 171.009 (Vernon 1999). Thus, a city council may engage in transactions with a nonprofit corporation even if a council member also serves as an uncompensated director of the nonprofit corporation. *See* Tex. Att'y Gen. Op. No. GA-0068 (2003) at 2-3. Under the Association's bylaws, a member of the Association's board of directors receives no salary for serving on the Association's board.[10]

Section 171.009 does not apply to a council member who is compensated for his or her services to the corporation, however, either as a director or as a member. It is not clear whether, at the time of the Council meeting, the Council member received compensation from the Association for his services as an Association member.[11] Some municipalities compensate their volunteer fire fighters. The legislature has noted, for example, that "many city charters allow for a modest level of compensation for volunteer fire fighters." HOUSE COMM. ON URBAN AFFAIRS, BILL ANALYSIS, Tex. S.B. 738, 77th Leg., R.S. (2001) at 1; *see* Tex. Att'y Gen. Op. No. JC-0199 (2000) at 2 (stating that a Gilmer volunteer fire fighter "is compensated at the rate of $4.00 per fire and $4.00 per drill, and receives an annual contribution from the city to the Fire Fighters Relief and Retirement Fund"). If the Council member, in fact, received more than ten percent of his gross income in 1999 from the fire department for his services as a member, section 171.004 obligated him to file an affidavit describing his interest prior to the May 3, 2000 meeting and to decline participation in the discussion and vote on the matters specially affecting the Association. *See* TEX. LOC. GOV'T CODE ANN. § 171.004(a) (Vernon 1999). Failure to have done so may have rendered the Agreements voidable under chapter 171, *see id.* §§ 171.003, 171.006, but the Agreements are not void *ab initio* in any case under chapter 171. Accordingly, the Agreements are conclusively presumed valid under section 51.003 of the Local Government Code. *See id.* § 51.003(a), (b)(1) (Vernon Supp. 2003).

---

[10]*See id.* art. VI, § 6.09, at 6.

[11]*See* Letter from James T. Shelton, Skellytown City Attorney, to Kim Oltrogge, Office of the Attorney General at 1 (May 5, 2003) (on file with Opinion Committee) [hereinafter Shelton Letter of May 5, 2003] (indicating that Mr. Shelton would inform the office when he received compensation information)

## IV. Lease and Conveyance of City Property to the Association

The City asks second about the legality of the Ratification and Lease, which served to convey to the Association (1) buildings, housing, related facilities, and (2) "[a]ll property, associated equipment, furniture, and personalty" related to the facilities. *See* Request Brief, *supra* note 1, at 2; Ratification and Lease, *supra* page 2, art. II, at 1. Under the Ratification and Lease, the buildings and related facilities are leased to the Association for a period of ten years for $1 per year, while title to the personal property is "relinquished and . . . conveyed." Ratification and Lease, *supra* page 2, art. II, at 1. Citing article III, section 52 of the Texas Constitution and Attorney General Opinion JC-0439, the City avers that the conveyances are legal because they "serve[] a public purpose of the City and . . . [are] subject to adequate controls to ensure that the public purpose is accomplished during the term of" the agreement between the City and the Association. Request Brief, *supra* note 1, at 2; *see also* Agency Agreement, *supra* note 2.

Attorney General Opinion JC-0439, which the City cites, analyzes a county's authority to transfer county funds to six different nonprofit organizations under article III, section 52. *See* Tex. Att'y Gen. Op. No. JC-0439 (2001) at 2. To ascertain whether a grant to a particular nonprofit organization serves legitimate county purposes, that opinion first considered specific statutes that authorized counties to take on certain responsibilities. *See id.* at 5-7; *see also* TEX. FAM. CODE ANN. §§ 264.006, 264.402, 264.403 (Vernon 2002); Tex. Att'y Gen. Op. No. JC-0582 (2002) at 2 (declining to address whether a lease agreement between a county and a museum is valid under article III, section 52 if the county "lacked an affirmative grant of express or implied authority to enter into the lease agreement").

The analysis Attorney General Opinion JC-0439 uses applies by analogy to a general-law municipality. Both a county and a general-law municipality have authority to exercise only those powers expressly granted to them or necessarily implied.[12] Thus, the City's authority to transfer property to the Association must be found in, or necessarily implied from, a statute.

Section 51.015(a) of the Local Government Code provides the requisite authority for both the lease of buildings and related facilities and the conveyance of personal property and equipment. Under section 51.015, a Type A general-law municipality may "lease, grant, or convey property located in or outside the municipality." TEX. LOC. GOV'T CODE ANN. § 51.015(a) (Vernon 1999). Given this statutory authority, we next consider the transaction's constitutionality.

Article III, section 52 of the Texas Constitution withholds from the legislature all power to authorize a municipality "to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation." TEX. CONST. art. III, § 52(a). The Texas Supreme Court

---

[12]*See also id.* (stating that the City is a Type A general-law city). *Compare Guynes v. Galveston County*, 861 S.W.2d 861, 863 (Tex. 1993) (stating that article V, section 18 of the Texas Constitution permits a commissioners court to exercise broad discretion to conduct county business, although "the legal basis for any action taken must be grounded ultimately in the constitution or statutes"), *with City of Soccorro v. U.S. Fireworks of Am.*, 842 S.W.2d 779, 780 n.1 (Tex. App.–El Paso 1992, writ denied) (stating that a general-law municipality's powers are "limited to those specifically granted by the legislature as enumerated in the relevant statutes").

has interpreted this provision to prohibit legislation requiring "*gratuitous* payments to individuals, associations, or corporations." *Tex. Mun. League Intergov'tl Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002). But, as the court has pointed out, "[a] political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Id.* The court will uphold the constitutionality of legislation requiring payments to individuals, corporations, or associations if the statute "(1) serves a legitimate public purpose; and (2) affords a clear public benefit received in return." *Id.* The court uses a "three-part test" to determine "if a statute accomplishes a public purpose consistent with section 52(a)":

> Specifically, the Legislature must: (1) ensure that the statute's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment; and (3) ensure that the political subdivision receives a [sufficient] return benefit.

*Id.*; *see id.* at 384 (stating that a public subdivision must receive "sufficient–not equal–return consideration" to render payment of public funds constitutional under article III, section 52). "This office has identified similar principles for determining if a particular expenditure serves a public purpose." Tex. Att'y Gen. Op. No. GA-0078 (2003) at 4. Thus, the governing body of a general-law municipality "'will avoid violating article III, section 52 if it (i) determines in good faith that the expenditure serves a public purpose and (ii) places sufficient controls on the transaction, contractual or otherwise, to ensure that the public purpose is carried out.'" *Id.* at 4-5 (quoting Tex. Att'y Gen. Op. No. JC-0582 (2002) at 6). A transaction that violates article III, section 52 is void *ab initio*. *See* Tex. Att'y Gen. LO-90-99, at 2.

Provided that the lease and conveyance satisfy the three-part test under article III, section 52 of the constitution, the City was authorized to lease and convey its property in this situation. *See* TEX. CONST. art. III, § 52; TEX. LOC. GOV'T CODE ANN. § 51.034 (Vernon 1999); *Tex. Mun. League Intergov'tl Risk Pool*, 74 S.W.3d at 384.

The City suggests, in relation to the second question, that if the Agency Agreement is void due to the Council member's dual service, the transfer of City property may therefore be invalid. Request Brief, *supra* note 1, at 1-2. Because the Agency Agreement is not affected by the dual service, we need not answer this question.

## V.     Collecting a Mandatory Fee in Water Bills to Pay for Volunteer Fire Fighting Services

We understand that the City has, for many years, "included a mandatory fee in the water bills to help pay for volunteer fire fighting services. In May[] 2000, the mandatory fee included in the monthly water bill was $1.50 per bill. The Agency Agreement between the City and the Association provides that the City may continue to collect the mandatory fees" for the Association's use. *Id.* at 2. Accordingly, the City asks whether it may "include a mandatory fee in the water bills to pay for volunteer fire fighting services." *Id.*

In November 2002, the City obtained an opinion from the Texas Municipal League, which suggests that the City lacks authority to impose such a fee.[13] Citing a 1985 attorney general opinion, JM-338, and a 1924 decision of the Texas Court of Civil Appeals, the Municipal League reasoned that the City did not have the necessary statutory authority to collect a tax to pay for volunteer fire services:

> Any fee attached to a utility bill by a general law city, which is not used to cover the expenses of providing the utility service for which customers are being billed, is a tax. General law cities, however, possess only those taxing powers that the legislature or the constitution expressly grants them. I am aware of no statutory authority for such a tax used to pay for volunteer fire services. The Texas Attorney General has similarly concluded that a general law city may not attach a monthly fee on utility bills to finance the police department.

TML Letter of Nov. 4, 2002, *supra* note 13, at 1 (citations omitted); *see Vance v. Town of Pleasanton*, 261 S.W. 457, 458 (Tex. Civ. App.–San Antonio 1924, writ granted), *aff'd*, 277 S.W. 89 (Tex. Comm'n App. 1925, judgm't adopted); Tex. Att'y Gen. Op. No. JM-338 (1985) at 1-2.

Attorney General Opinion JM-338 determined that a $6 charge, which a general-law city assessed against all home and business owners in the city, for financing the city's police department is an unlawful tax. *See* Tex. Att'y Gen. Op. No. JM-338 (1985) at 1-2. The charge appeared "on monthly utility bills," but because it was intended for the police department's use, it had no connection to the costs of providing utility services. *Id.* at 1. Accordingly, the charge was "intended to raise revenue" and was a tax. *Id.* Because a general-law municipality had no "statutory authority . . . for [this] method of taxation," the opinion concluded that the $6 charge was "not a proper method for raising revenue to support the police department." *Id.* at 1-2.

A Type A general-law municipality has the prerequisite specific statutory authority to levy certain taxes. *See also* TEX. CONST. art. XI, § 4 (permitting a general-law municipality to "levy, assess and collect such taxes as may be authorized by law"). For example, a municipality in which a fire control, prevention, and emergency medical services district is established must impose an additional sales and use tax "in the area of the district" to finance the district's operation. TEX. TAX CODE ANN. § 321.106(a) (Vernon 2002). A general-law municipality has no statutory authority to levy a tax for fire protection services by adding a tax to each utility user's bill, however.

Consequently, the City may not levy the tax in this manner, and the provision in the Agency Agreement allowing the City "to continue to collect the $1.50 monthly fee attached to the water bills"[14] is void.

---

[13]Letter from Bennett Sandlin, Assistant General Counsel, Texas Municipal League, to Honorable Lucille Lawrence, Mayor of Skellytown, at 1 (Nov. 4, 2002) [hereinafter TML Letter of Nov. 4, 2002], attached to Shelton Letter of May 5, 2003, *supra* note 11.

[14]*See* Agency Agreement, *supra* note 2, at 2 (covenant 5).

## S U M M A R Y

Because the City of Skellytown executed various agreements (the "Agreements") with the Skellytown Area Volunteer Firefighters-EMS Association (the "Association") over three years ago and no lawsuits to invalidate them have been filed, the Agreements are "conclusively presumed" to be valid unless, among other things, the Agreements were void *ab initio*. *See* TEX. LOC. GOV'T CODE ANN. § 51.003 (Vernon Supp. 2003). The fact that a city council member was, at the time the City approved the Agreements, also a director of the Association does not affect the Agreements' validity.

The City had statutory authority to convey to the Association personal property, such as equipment and furniture, and to lease City buildings and facilities to the Association. A conveyance or lease complies with article III, section 52 of the Texas Constitution if (1) it primarily accomplishes a public purpose; (2) the City retains sufficient control to ensure that the public purpose would be accomplished; and (3) the City receives a sufficient return benefit.

A Type A general-law municipality has no statutory authority to attach a $1.50 charge to water bills to fund the costs of volunteer fire fighting services.

Very truly yours,

GREG ABBOTT
Attorney General of Texas


BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Kymberly K. Oltrogge
Assistant Attorney General, Opinion Committee